## JOHN JACKSON v. EQUITABLE BUILDING AND LOAN ASSOCIATION.[1]

May 3, 1935.

No. 30,284.

*Thompson, Hessian & Fletcher* and *John J. McKasy,* for appellant.
*Thomas E. Latimer, J. A. Mansfield,* and *Godley & Olson,* for respondent.

HOLT, JUSTICE.

Plaintiff appeals from the judgment entered upon an order granting judgment for defendant notwithstanding the verdict.

The complaint alleged that on January 6, 1930, plaintiff loaned defendant at its request $4,419.16, which sum defendant promised

[1]Reported in 260 N. W. 880.

to pay to plaintiff upon demand, that payment has been demanded, and has been refused. The answer was a denial. The facts are in short these: The defendant is a building and loan association organized under the laws of this state and started in business in Minneapolis in 1925. In February, 1925, it entered into a contract with Equitable Holding Company, a corporation, whereby defendant agreed during its existence to pay to the holding company all membership fees and loan commission charged subscribers and borrowers by the defendant association, also to pay the holding company at the end of each month one-fourth of one per cent of the book value of all assets of defendant up to the value of $1,000,000 and one-sixth of one per cent on all assets in excess of $1,000,000, and defendant agreed to collect a membership fee on installment shares and running shares of two per cent of the par value. In consideration thereof the holding company agreed to pay all the operating expenses of defendant, including the salaries of defendant's officers, commissions to its salesmen, and all expenses incident to its business. One Leaper was president of the holding company and one Bryan was secretary. Both were on the board of directors of defendant, and Leaper was its secretary, treasurer, and manager up to the first days of January, 1930. In the spring of 1929 defendant established a branch office in the city of St. Paul with one Wilcox in charge, who had some contract similar to that of the holding company under which Wilcox was to pay the bills of defendant in operating the branch office. Wilcox did not pay the bills, and he embezzled moneys of defendant to the amount of about $2,300. Shortly before the end of 1929 the defalcation was discovered. Wilcox disappeared. The situation came to the attention of the commissioner of banks, and he warned defendant that unless the bills were paid it could not function. In addition to Wilcox's defalcation and the bills incurred by him in the amount of about $2,500, there were unpaid bills incurred by defendant in running the main office at Minneapolis in the amount of $2,500. The board of directors of defendant met. Mr. Leaper's resignation as officer and manager of defendant was obtained, and he and Mr. Bryan were requested to procure the money to pay the bills in 24 hours

or the contract with the holding company would be canceled. It appears that a surety bond covered Wilcox's defalcation. Mr. Bryan borrowed $2,300 on the strength of the surety bond and raised some $400 or $500 more. Leaper applied to plaintiff, his brother-in-law, a wholesale hardware merchant and banker at Aberdeen, South Dakota, for $5,500. The request was by telephone. It was granted and the amount sent by wire, the Western Union Telegraph Company delivering a check payable to Leaper, who deposited it in his own bank and drew a check thereon in the amount of $4,419.16 payable to the order of Bryan. Bryan indorsed it to the order of defendant, and it, together with the amount raised by Bryan, was deposited in a special account of defendant opened in the First National Bank, at the direction of defendant's board of directors. The special deposit was to be used only to pay the bills of defendant, and the checks drawn thereon had to be signed by Bryan and countersigned by one of three designated directors of defendant.

The court submitted to the jury whether plaintiff advanced to defendant money which was used by it in payment of its debt and, if so, it ought in equity and good conscience to repay it. And the court stated that plaintiff's claim was that when he parted with the money he thought he was loaning it to defendant; that he did not then know of the existence of the holding company; and that plaintiff pointed to the fact that the money Bryan procured, at the demand of defendant's board, was considered a loan to defendant, for it was repaid, Bryan having taken an assignment of the surety bond protecting defendant against Wilcox's defalcation. If there is any substantial evidence that plaintiff loaned or advanced this money to defendant, it was error to grant judgment notwithstanding the verdict. Leaper testified:

"I got Mr. Jackson on the long distance telephone, explained briefly to him the situation, that we were informed at the meeting by the board of directors that money had to be in there, I didn't know exactly the amount, but that there were some bills and a shortage that had to be made up or the banking department would

take over the affairs of the association. I told him that we had a claim against the bonding company and that I did not think there would be any argument about that claim, and that the money would be coming back with which to pay him back from that source. * * * He said he would get the money and mail it down."

Plaintiff, testifying by deposition as to this telephone conversation, said:

"Well, of course that was four years ago, and I can only remember the high points, but it was, roughly, that the Building & Loan was in trouble and that some man had gone south with some funds, and that the examiner, I don't recall his name, had insisted that they put in enough money to cover the shortage within twenty-four hours or else they would close up the Building and Loan Association and liquidate. I asked him how much it amounted to and he said $5,500, so I told him that I would mail that down and he said no, to telegraph it down, so I telegraphed it down. * * * He said I would be repaid when the association collected from the bonding company for the shortage of this man who defalcated."

From this conversation we think the jurors could well conclude that plaintiff understood when he wired the $5,500 that he lent or advanced the same to defendant. It is certain that $4,419.16 thereof went into the hands of defendant and was used to pay bills contracted by it. Defendant took special care that this money, as well as that procured by Mr. Bryan, should be applied only to the payment of its obligations. It is true that defendant had a contract with the Equitable Holding Company to pay the operating expenses such as some of the bills paid with the money furnished by plaintiff; but it is also to be remembered that some went to pay for the bills and defalcation of Wilcox for which the holding company seems not to have contracted to pay. We also realize that in the subsequent conduct of the parties there are things discrediting the fact that plaintiff advanced or loaned the money to defendant. Leaper deposited the whole amount in his own bank account and gave a check for only $4,419.16 thereof to Bryan to be turned into defendant's special account; the balance of $1,080.84 he used for his own

purpose; and a month later sent the holding company's note and his own for the respective amounts to plaintiff, who retained them without objection until long after. But there is this testimony of Leaper's that may have lulled plaintiff into security, *viz.*, that on the holding company's note is the indorsement:

"This note is secured by claim of the Equitable Holding Co., against the Aetna Casualty & Surety Co. [signed] Equitable Holding Co. by C. G. Leaper, Pres."

There was testimony that Mr. Bryan borrowed the $2,300 that was placed in defendant's special deposit and secured its repayment by the bond mentioned. So evidently Leaper and Bryan were permitted by defendant to use the bond. The jury had also a right to consider that even though Leaper was ousted as an officer in charge of defendant's business he was nevertheless retained at this time as temporary manager, and he and Bryan were directed by defendant's board of directors to get the money needed in 24 hours. The money that defendant demanded plaintiff supplied, and defendant accepted and used it to pay its obligations. The jury could find that when plaintiff wired the money it was at the request of and for the benefit of defendant, and that it would be paid back when defendant realized on the surety bond it had; at least, it could well be found that he so understood, and that the amount here in suit actually came into defendant's hands and was used by it in its business. It does not appear that plaintiff knew of the existence of the holding company until a month after the money was sent, or of its contract with defendant, so it cannot be said that he loaned or advanced it to the holding company. As far as plaintiff is concerned, he lent the money either to Leaper personally or to defendant. The testimony sustains the verdict that it was advanced upon defendant's credit and not Leaper's.

The learned trial court considered that Leaper was at the time shorn of all power to borrow money in behalf of defendant. Even so, when defendant obtained plaintiff's money from its temporary manager, whom it had charged with the duty of securing the needed funds, it in good conscience ought to repay it to plaintiff, who sent

the same in reliance upon Leaper's representation in defendant's behalf. For over four years defendant had held out Leaper as the one in charge of its business. And the jury could draw the inference that Leaper's brother-in-law, this plaintiff, knew of that fact, but had no knowledge of the existence of the holding company or its contract with defendant.

On this appeal no error against defendant in the admission of evidence can be considered. We think the court erred in rendering judgment notwithstanding the verdict.

The judgment is reversed.

STONE, JUSTICE (dissenting).

I acknowledge that there is some testimony in the record which, standing alone, seems to sustain the conclusion that plaintiff lent his money for the benefit of defendant. But that testimony, in my judgment, is conclusively refuted by what plaintiff did at the time. It is but another case where unequivocal action at the decisive moment should control as against mere words coming long afterwards at the dictation of self-interest.

Plaintiff remitted to Leaper personally. He neither took the note or other obligation of, nor did he ask for even an acknowledgment from, defendant. Instead, he accepted in settlement the note of Leaper for $1,080.84 and that of the holding company for $4,419.16, the total being the $5,500 he had advanced. That, to my mind, demonstrates that plaintiff made no loan to defendant. If, as I think, he made one to Leaper and the holding company, the money became their property to do with as they pleased. To the extent that defendant had advantage of it, the money had ceased to be that of plaintiff and had become that of Leaper or the holding company or both. If that is the correct view of the whole evidence, and I think it is, defendant has never been enriched, unconscionably or otherwise, by the money of plaintiff. For that reason I dissent.